Thank you, Your Honor. May it please the Court, Mary Gibbons appearing on behalf of Appellant James Graf. Ms. Gibbons, you have 20 minutes for your side. You are the appellant. Are you aware of the clock? Can you see the clock anywhere? I will endeavor to watch it here. I cannot see your clock. All right. Do you intend to reserve any time? I would like to reserve five minutes for rebuttal, Your Honor. All right. Normally I would tell counsel to watch the clock, and the clock, of course, is right at the lectern. But in your case, I'll try to let you know when you only have five minutes left. Thank you, Your Honor.  Thank you, Your Honor. I would like to initially discuss the question of the establishing of the attorney-client privilege, which obviously had tremendous significance for the case, the government's case against Mr. Graf, in light of the evidence that was introduced through the three attorneys who testified. As the Court has laid out in the briefing, there was a pretrial motion to exclude the evidence from the attorneys on the grounds that it was privileged. That motion was denied on the basis that Mr. Graf had not established a personal attorney-client relationship with these counsel, but rather that his relationship with them had evolved and developed and was sustained as a result of his relationship with the company. Certainly the attorneys were retained by the corporation, and I think it's up to you to tell us why somehow or other that got converted into individual representation. Well, I don't think that it was ever converted. I think that it was always a situation where there were two different parties being represented. One was the corporation, and the other was Mr. Graf. Mr. Graf was not an employee of the corporation. He was not an officer or a director. He was, I guess the characterization was that he was an independent consultant. But he seemed to be running the entire operation nevertheless. He certainly was. He was the primary contact point that the attorneys had with the corporation's business. He was the primary contact point that they had with the various difficulties that came up that were addressed by the Alexander firm and also by the Smith & Downey firm. And the issue here really goes, I think, not to whether he had a separate personal relationship, but the fact that these lawyers did not ever address the fact that they had a corporation here and then they had a third party to the corporation who was really directing the show. Ms. Gibbons, this is Judge Tallman. I hear what you're saying, but the case law, as I read it, let's call him a speaking agent for the corporation, carrying out the corporation's legal business on behalf of the company and a need on behalf of Mr. Graf to show that in addition to that relationship, he had a personal attorney-client relationship with these lawyers and that he was interacting with them for the purposes of obtaining personal legal advice. So I think you have to show more than the fact that he was the key contact between the company and the lawyers, don't you? Well, if I could suggest a slightly different interpretation, the case law that focuses on the need to have a separate personal relationship is primarily case law that concerns the situation where you have a corporation and then you have individuals who clearly are employed by or are directors or officers or significant parties within the corporate structure itself. You have the Rule case certainly involved that where you had the CFO. You have other cases where the individuals involved, the Beedle case from the Third Circuit, are cases where the person who now is at odds with the corporation used to be a part of the family, as it were, and was an insider. Here you always had the individual, Mr. Graf, who never came into the law firm saying I'm a director, I'm the CFO, who never had that oneness with the corporation, but rather he had a separateness from the corporation right at the outset. And these lawyers never asked about this. Ms. Gibbons, that's not consistent with the position that you took at the beginning of your argument, which was that he was the primary contact on behalf of the company, and that is no different from Mr. Rooley in the Broadcom case, who was the company's chief financial officer, and of course he was the primary contact with the lawyers conducting the internal investigation and with the outside auditors on the backdating issues. So I'm not sure where your argument gets you. I'm not hearing any argument with regard to why the lawyers should have understood that they were the personal attorney rendering personal legal advice to Mr. Graf at the time that he was communicating with them about corporate matters. Mr. Rooley was, in fact, as Your Honor states, the CFO. He was somebody who was a member of the corporate structure. Here I think the initial problem comes about because none of these lawyers said, why are we taking all our direction from somebody who's not in the corporate structure? Why are we dealing with a person who is an outside consultant? Why are you not somebody, Mr. Graf? Why shouldn't we follow the Eighth Circuit's lead in Ray Beder, where they basically found that the consultant was the speaking representative for the company and that an attorney-client relationship between the company and the attorneys could include communications involving the consultant there? Well, it could involve it, but nevertheless, here you have the corporation who's paying all the bills, who is signing and creating the relationship, and yet you still have this third party. And bearing in mind, of course, that the Alexander firm had represented Mr. Graf in his prime care business, which was his previous business that led to the cease and desist orders, which were the very reason why he couldn't be an insider in this corporation. He had a conflict from the get-go. Ms. Gibbons, we have a factual finding by Judge Morrow, after hearing the testimony from all of the parties, including Mr. Graf, that there was no relationship between the work that the Alexander firm had done on the prime care matter and the work that they did later in time on behalf of EM Corporation, which is the heart of the communications that Mr. Graf was engaging in with those lawyers at that time. So I still don't see how that establishes a personal attorney-client relationship where the scope of the engagement is solely confined to the problems that EM was having with the health insurance regulators. Well, the prime care situation was, in fact, a separate operation. The two are not related except for the fact that the prime care situation created the conflict of interest that made Mr. Graf have to be an outsider in terms of this business. He came to them conflicted. A conflict of interest establishes a potential for bar disciplinary action against the individual lawyer for breach of his or her ethical obligations. It does not establish the existence necessarily of an attorney-client relationship, which the burden is on Mr. Graf to show existed with regard to the EM matter. In the Eureka case, which is discussed in Teleglobe, they talk about the fact that when you have a joint relationship where you have two separate parties, and that would be our position here, obviously, you have EM and you have Graf, two different entities, as it were, and they are conflicted. And the court there says, and Teleglobe accepts, that the fact that the lawyer may have an ethical problem is not key, but it certainly is not the basis for depriving the client, one of the joint clients, of the privilege which he believes he has all the way through. And Mr. Graf, in his testimony, clearly believed that. Let me stop you there because, again, I go back to the factual findings by Judge Morrow after the evidentiary hearing. She found, as a matter of fact, that Mr. Graf did not have an attorney-client relationship with any of these attorneys. And, therefore, there cannot be joint representation in the face of that factual finding, which we would have to find clearly erroneous in order to adopt the argument that you're urging upon us. Well, I think that it was a clearly erroneous finding because once you have the showing that he does have a joint relationship, he's a separate entity and he's not a part of the corporation. I agree with you that if he can establish the existence of an attorney-client relationship on his personal behalf, then we would have a joint representation situation.  You have to first establish, as a matter of fact, the existence of that relationship before we can conclude that there was a joint representation. And you can't get over the hurdle on the lack of a factual showing. He never hid from any of these attorneys the fact that he was not a corporate officer, director, employee, insider. He was always known to be a consultant, an outsider. The attorneys, surprisingly, never asked him, why is that, Mr. Graff? They just simply took him as a stranger to EM and accepted him. EM is paying the bills, of course. I think that's not preclusive. A third party can always pay the attorney bills. But yet they're taking direction from somebody who has no obvious relationship or disclosed relationship. He's not a lawyer. They are. They never say to him, how come you're calling the shots, Graff? Ms. Gibbons, you mentioned in passing the Beevill case, Beevill, Bressler, Shulman, Asset Management. Where do you contend Beevill fits into this analysis? For example, it's been suggested that the Ninth Circuit, which has not yet adopted the Beevill test, whereas quite a few other circuits have, where do you see Beevill in this area that we need to sort out? I think that Beevill is a situation where you have various individuals who come in to representation as part of one corporate family. They are all part of the corporation. You don't have a situation where the lawyers have two different entities walk into their office. The corporate entity on the one hand, Mr. Coccott, and Mr. Graff. Who's he? In Beevill, you have a situation where the lawyers are faced with one group that then becomes separate groups. Here you always had separate groups coming in. But why shouldn't we adopt the five-part Beevill test in order to determine whether or not Mr. Graff has a recognizable attorney-client relationship based on these facts? Because in a situation where you have employees or officers or directors, people with an established, known relationship to the corporate entity, then something has to happen to set that apart from the reasonable view of the lawyer that I have one client here. In this situation- I grant that there are differing fact situations between Beevill and this case. Yes. But what about the test? The question you were asked by Judge Tallman, what about adopting the test? Yes. Can you prevail if we adopt the Beevill test? I think that in this situation, the Beevill test would not be preclusive to us because we don't have the situation where we have a unified group on the one hand, then becoming a diverse group. This is a situation where you have two different people coming into the lawyer's office right at the outset. You don't have to say, at what point did this fall apart? At what point, what are the additional things you have to show to establish that this one person is not just part of the group but is also separately covered by a privilege? I think that that's the distinguishing factor here that makes Beevill not really applicable in this situation because you just have two separate groups right from the outset. Counsel, even in Beevill, the Third Circuit recognized that there might have been a period of time where the individuals were jointly represented by the firm that ultimately was engaged by the corporation and that those communications in the initial phases of the dance, if I can use that term, would be protected. But that when the individuals were told, it is now time for you to get separate counsel, then the Third Circuit said, applying the Beevill test, any communications from that point afterwards between the firm now clearly representing the corporation and those individuals would not be protected by the attorney-client approach. So why doesn't the Beevill test apply to this set of facts? Well, for one thing, none of the attorneys here gave Mr. Graff any sort of an up-john advisement, an advisement that, you know, now things have split up enough that we have to all be careful here or this may not be privileged. There's never any advisement to that effect. The lawyers are all treating this as a situation where everybody's covered by the privilege. Graff is getting correspondence and mail that says privilege. How can you say that in the face of Judge Morrow's factual findings? She found that there was never any request by Mr. Graff of these lawyers to represent him. And the mere fact that he was carbon copied on communications involving corporate matters was not dispositive as to whether or not he had a personal attorney-client relationship. Well, I think that he was a lot more than carbon copied, in all fairness. He was the driver of this bus. That's why he was convicted. He was the one who was running the show. They were calling him for direction. They were not calling him for coca. Counsel, let me interrupt. You're down to three and a half minutes remaining at this point. I just mentioned that for your information. Well, unless the Court has a specific question, I'd like to reserve what I have left for rebuttal. You may do so, Counsel. You may do so. Thank you. Thank you. We will hear from counsel for the United States. It may please the Court, Mark Krauss and Jill Feeney for the United States. It was our intention to split our time. I would address the first two issues related to the attorney-client privilege and the claim that Mr. Connors, like Connors' testimony was admitted, testimony was admitted in a clearly erroneous fashion. Counsel, just watch the clock. You have 20 minutes between you, but how you allocate it is your choice. Very well, Your Honor. Unless the Court would like to take the issues out of order, I'll take them in the issue of the defendant's brief. Addressing the first issue as to whether the district court erred in admitting testimony from the three attorneys as well as exhibits related to their testimony, I think the Court identified the issue. Whether the Court applies the traditional eight-part test or decides to adopt the bevel test, the district court plainly did the right thing in allowing the testimony to be admitted. Certainly, the bevel test is a very straightforward way to analyze this issue. Let me ask you this question. Does it make a difference under the bevel test as to who goes first? Namely, why could not the corporate attorneys simply have told Graff right from the outset that, look, I want it to be clear that we're communicating with you based upon your relationship with the corporation and we have no responsibility to deal with you on an individual basis? Wouldn't it have been as simple as that? And perhaps under bevel, who is the first one to assert the privilege maybe of some relevancy? Well, Your Honor, I think that question can be addressed in a couple of different ways. First of all, if you look at the correspondence between the attorneys and the corporation, and it makes clear that the client is the corporation. Indeed, to use, for example, the correspondence between the Alexander firm and Employers Mutual, the defendant isn't even copied on it. The pretension agreement is executed by William Cocotte. He's the one who's paying the bills. So from the outset, it makes clear. Let me just clarify this. I may not be fully conversant with the record. Is there anything in the record where any of these attorneys said, look, we have no responsibility to you, we're not representing you in an individual capacity? I don't see anything in there. We have to piece together all of this from a whole bunch of pieces of information and communications or lack of communications. I guess I come back to my simple question in trying to establish some sort of standard, even the application of evil. Should we not consider who is the one that has the responsibility in the first instance of asserting the privilege or making appropriate disclosures? If the court is asking whether upturn warnings were given from the outset at the point of engagement, the answer is no. However, if you're asking it from a policy standpoint, whether it makes more sense to put the onus on the lawyer for the corporation, I would submit that it would not necessarily make sense. Bearing in mind that in the corporate context, every contact with an employee, an agent or otherwise, an officer or director, would require the outset of every matter and upturn warning really just doesn't make a whole lot of sense. It's clear in this context, as the district court plainly found, that everybody understood that these attorneys were representing the corporation and the corporation alone. The correspondence that the defendant signed both before and after his relationship with employers mutual indicate that he understood that the attorneys represented the corporation and the corporation alone. Which correspondence is that? I thought I heard you say earlier that it was Mr. Cocotte who received the engagement letter. Yes. But Mr. Graff was not copied. That's correct. So how does he know that the scope of the engagement is limited to the company? I would direct the court's attention to a declaration submitted by the defendant in support of a motion to get out from a default judgment found at pages 57 and 58 of the exception record. In that declaration, the defendant refers to the attorneys at the Alexander Law Firm as well as Fifth and Downey as being the attorneys for employers mutual. There's no claim in that declaration that he had some sort of joint representation or that he was somehow personally represented by either of those firms. He refers to them simply as employers mutual retained these law firms. If you look at the correspondence after the engagement, during the period of time in which those two firms were representing the corporation. But as Ms. Gibbons points out, the fact that the corporation is paying the bills is not this positive on the question of whether or not it might also be representing Mr. Graff. You have to concede that, do you not? I do. But if you look at the Munoz decision, this court found that those are the most important factors. Who is on the retention agreement? Who is paying the bills? In that case, it's a highly analogous situation. You had an individual who claimed a personal privilege with respect to communications with attorneys. And in support of that claim, pointed out that he sort of brokered the engagement, that he had a pre-existing relationship with the attorneys, and he was the one who directed them to the corporation. And although those facts may have cut somewhat in his favor, this court found that that was not sufficient in large part. Most importantly, to use the court's words, because of who was paying the bills, who was on the retention agreement, and the general expectations. There was no implied contract. So should we confine Upjohn warnings to those situations in which the corporation retains counsel to conduct an internal investigation or to prepare the defense of the company? And as a necessary part of that effort, they have to talk to employees of the company. But as the Supreme Court said in Upjohn, they need to make clear to the employees that they are not representing them and that any attorney-client privilege that attaches is waivable solely at the discretion of the company, even though the communications that they make are within the company's attorney-client privilege unless and until the company decides to waive it. Yes, I think that that might be one way to make it most clear in terms of getting back to Your Honor's question with regard to who should be honest beyond in the context of an internal investigation as opposed to the ordinary operations of the corporate structure. It certainly makes more sense. It also, I think, more closely complies with the way that the corporate structure works, that people feel free to be able to call up the corporate attorney and not to have the sort of – to ensure the free flow of communications in the everyday business of the corporation to make clear that the corporation is really represented only by the attorney and not the individual. The – so – and I think the Court's statements earlier in connection with questions to opposing counsel are appropriate in that the burden of proof here – the defendant bears the burden of showing the privilege, but more importantly, in light of the district court's findings, which are subject to the clearly erroneous standard, it's a very high burden the defendant must overcome. So regardless of whether the court applies the traditional eight-part test or the VIVIL test, it's plain that the defendant has failed and has burdened to show any sort of personal relationship, call it joint, call it personal, call it what have you. What's also perhaps – and this may have been in large – my own fault in the way that the brief is structured. If you look at the actual evidence that the defendant sought to preclude, most of the – most of the testimony in connection with Mr. Agnello, for example, did not – did not relate to attorney-client communications. They related to false documents. They related to information that was clearly intended to be conveyed to third parties. In those situations, for example, you could rely on the eight-part traditional test to conclude that these are not attorney-client communications. But the most damaged piece of evidence is the notice to Mr. Graff that what you are doing is illegal. Stop it now. And certainly that was the testimony from Mr. Fitzsimmons and Mr. Connors. And there, the district court's findings were pretty clear. The defendant never communicated a desire for any personal representation. You would agree that if he had been able to meet his burden of establishing a personal attorney-client relationship, that a statement by his lawyer telling him, don't do that, it's illegal, would be privileged. Well, again, the issue also goes to the waiver issue. And as the government laid out in its brief under the De La Hara case, in this case, the defendant made no attempt to make sure that these communications were privileged. Recall that after the – This is the untimeliness argument, that he waived it because he waited too long? Yes. That wasn't the question I asked you. The question I asked you was, if he had been able to show, which Judge Morrow found he could not, that there was a personal attorney-client relationship, if that were established, then that statement would be protected, wouldn't it? Unless it was waived. Right. But I would also submit that with respect – so, again, just to parse out, because there are multiple attorneys here, with respect to communications between Connors and Fitzsimmons, he would have to show that his communications – that he was in a personal relationship with the attorneys. There's the additional problem in connection with that, that the connection may be – that privilege may have been waived by his subsequent actions. He waited, what, was it two years? Well, Your Honor, he waited more than that because he started receiving notice in connection with a letter that he received in – that is, just approximately two years. November 2003, he received a letter indicating that the privilege had been waived by the independent fiduciary and to notify the government if there were any claims of any personal privilege. Following that, on May 10th of 2004, he received notice that attorney communications were going to be used. They were alleged in the indictment. Two weeks later, on May 25th, 2004, he started receiving discovery to include the correspondence with the attorneys. On April 18th, 2005, some of those communications were used in connection with opposing a motion for bond. And then, of course, July, so a few months before trial, the government had identified its exhibits to include this correspondence in the testimony. I see that I'm going a little bit over, so unless the Court has any additional questions with respect to privilege, I'll move briefly to the clearly erroneous – the issue of Connors' testimony. Mike Connors testified that he informed the defendant that the plans were not in compliance with the law, that they were illegal. There was no objection at that time, no contemporaneous objection, so the clearly erroneous standard applies. It's important to realize that the statements in context – Clearly erroneous or clear error? Clear error, I apologize. Clear error. And it was not clear error for the District Court to decline to strike this testimony. It wasn't opinion testimony. In fact, if you look at the statements in context, it didn't even relate to the defendant's state of mind or his own culpability. It really – what Mike Connors was saying is, if I were to participate, it would be illegal for me. And in the context of the entire trial, a six-week trial in which approximately 100 witnesses were called, thousands of exhibits, it's hard to say that this really affected anything. As you can see, it's fairly isolated statements even within Mr. Connors' testimony. Unless the Court has any further questions, I'll hand off to my co-counsel. Thank you, Counsel. Thank you, Your Honor. May it please the Court. I'm Jill Feeney for the government, and I'm going to address the second two issues that were raised in the appeal brief, the first one being the Rule 29 issue with respect to the health care fraud   counts in this case 18 U.S.C. 669. Essentially, the defendant argues, although health care benefit program in this case meets the statutory definition, because it was operated fraudulently, this Court should deem it to fall outside the reach of the statute. That's essentially the argument here. And if Your Honors apply the plain rule of statutory construction that where the text is unambiguous, you simply, the text governs. It was clearly established that there were health care benefit programs at issue in this case. And the Court should reject the defendant's wish to essentially graft on an additional element to the statute, which is not contained within the four squares of the text. That was an argument that was raised for the first time on appeal. The defendant also raised a second. Are you arguing waiver, or should we reach the merit? Well, Your Honor, I think under the case of the Quintana Torres case, which we cite in our briefs, although Rule 29 motions don't need to be made on specific grounds, to the extent that they are, other grounds are waived, and this Court is supposed to review only to prevent manifest miscarriage of justice. But I think in any event, on the merits as well, Your Honor, looking at the plain language of the statute, the elements of the crime were met here. There was a health care benefit program, and there is no basis for essentially grafting on an additional element. So what you want is to reach the merits and make that declaration as a matter of statutory justification. Your Honor, I don't think you have to reach the merits, if that's your question. I don't particularly want you to do anything. Except rule in our favor. Other than affirm. But I think either way, Your Honor, the government is not asking the Court to reach out and do that. Well, I'm not looking for extra work. I'm just trying to figure out whether or not you think this is teed up for resolution, or we should just declare it forfeited or waived. Well, Your Honor, I'm sorry, Your Honor. I do think under the case that's cited by the government, it is waived, and that the review is really one to prevent a manifest miscarriage of justice, which plainly does not exist on the record here. Now, the defendant also raises another claim with respect to these counts of conviction, and this was the Rule 29 motion that he raised at the trial level, which is essentially that the money that was diverted by defendant was somehow membership fees and not premiums of a health care benefit program. This was briefed before the district court. The district court made findings that there was no distinction between membership fees and premiums, and that in any event, whether membership fees or premiums, the monies taken were assets of a health care benefit program. So I think with respect to both of those claims, Your Honor, there is no basis to overturn those counts of conviction. Now, going to the last issue in the case, what I'll reference as the sealing issue, in this instance, the defendant is trying to make some First Amendment claim. In reality, there are three categories of documents. Well, isn't the only real dispute over the last category, which was I'll call it the proffer of what the government's case in chief was going to look like? That's correct, Your Honor. The other two categories of documents the defendant has, the last one that Your Honor referenced with the situation were at a pretrial conference. The court was concerned about the length of the government's case, and in an exercise of its judicial management function, asked the court to make a filing setting forth its witnesses and exhibits and why they were not cumulative in this instance. The government did that in camera, and later, at a subsequent conference on October 4th, the court more or less indicated that what the government had filed was not useful, by and large, to the court, and that was the sum and substance of that document. No further references were made to it throughout the trial, and it was certainly nothing that was used by the court in any way to make any decisions of any kind. I think in this instance, the defendant has not proven, certainly, that this is the type of document that is covered by the First Amendment right of access. Under Press Enterprise 2, you know, what's called the experience prong and logic prong, you have to show that the place and process have historically been open to the press and general public, and that also the public access plays a significant positive role in the functioning of the process in question. I think in light of the facts here, that this was a judicial management document that ultimately was not even utilized, there is no basis and no precedent for saying that this is something that is entitled to First Amendment coverage, and beyond that, there's no other basis for the defendant to have access to it, and that the abuse of discretion standard is then the one that applies. And clearly, courts have the discretion to seal things if they deem it appropriate. Something that comes up often in the trial court, for instance, is sometimes defendants will make filings asking for resources in which they sort of lay out their defensive strategy, or they might tell the court, we want to present a particular kind of defense, and we're going to make the showing to you, Your Honor, that we should be permitted to do that, but the government isn't going to get it. So there, you know, this is not an unusual situation. These types of documents reflecting strategies sometimes get filed with the court. They are done so in camera. I take it what they are are simply a summary of if called to testify, witness number three will say the following. In very summary fashion, Your Honor, in addition referencing the exhibits that were expected to come in. Correct, Your Honor. And the witnesses were never called? Well, there was a trial, Your Honor. No, no, I mean in terms of what the document was that the court had concerning those witnesses. I'm sorry, Your Honor, I'm not understanding your question. I'm not clear that the information that the court had was relevant at all in the course of the trial. Correct, Your Honor. I think what's clear from the record is the court asked for this document, then said it wasn't useful to them. And then in terms of making evidentiary rulings, of course, as the court found below, George Moore found below on the motion to unseal below, what happened, the decisions that were made in court and the decisions that, you know, are part of this appeal are what actually happened in court. So it wasn't like decisions were made on the basis of this document. Decisions were made and objections were made based on what actually happened in court at trial. Thank you, Counselor. Your time has expired. Ms. Gibbons, you have some reserved time. Thank you, Your Honor. I would like to just address the most recent point first regarding that sealed document. We obviously don't know if the court used it or not. The reason that the court requested it was it's in the transcript. She wanted to know why the government was calling so many witnesses to see what the various witnesses were going to testify to. So if the court read it and... Counsel, how is that any different from a district judge who says to the parties, I want to see a summary of the testimony on direct examination of every witness that you were going to call in this case and then uses that document as a case management tool to say to both sides, I don't think we need witness number five because that's cumulative of witness number four. Can't you guys stipulate to witnesses 10, 11, and 12 so that we can get this exhibit in without having to lay a foundation on chain of custody? Our trial judges do that all the time in civil and criminal cases. If that is the type of discourse that is being had with the parties, then it's key that it be had with the parties. For the court to simply have one side create a road map that the court then can use in the face of what were, in this case, hundreds of relevancy objections, the court is operating from the government's presentation of relevancy that the defense has never had any access to. Now, trial management is one thing, but... I don't understand what we're arguing about here. I really don't. We have... Go ahead. It's very hard to make this argument because obviously we don't have this document, and so we're arguing blind here, and that's exactly the problem. We have to take the court at its word, which in general is fine.  But if we accept... And that's what we're being deprived of here. We're having a trial... Ms. Gibbons, if we accept your argument, that would be true in every ex parte filing, so that even ex parte filings by the defense that the prosecution never sees might be said to have informed the exercise of the court's ruling and therefore should have been turned over to the prosecution. You wouldn't want that, would you? There's a procedure in place whereby a record can be created, and now I think it is the local rule in the court, that the substance, the nature generally of the under seal pleading should be disclosed so that it can be tested by the other side. Here we're talking about not only under seal documents, but non-public dockets. Ms. Gibbons, we get portions of the record all of the time that were admitted and sealed ex parte. On appeal, the appellate judges review them to determine whether the district judge abused his or her discretion, and you never see those documents. If we adopt your rule, all of those documents would have to be disclosed to both parties. No, not that the documents themselves... We're not objecting to sealing in general. We are objecting to the submission of documents without any adversarial process on an ex parte basis with non-public dockets so that things are going on that are being handled under seal that we have no idea have even been filed. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and the court will take a brief recess. All rise, the Sotomayor court stands in recess.
judges: Block, O'scannlain, Tallman